DARLENE BEASLEY *et al.*, Plaintiffs-Appellants, v. KAMAL ABUSIEF, Defendant-Appellee.

Fourth District   No. 4—85—0867

Opinion filed August 5, 1986.

Carlton M. Kagawa, William Garrison, and Kevin M. Colombo, all of Saikley, Garrison & Kagawa, Ltd., of Danville, for appellants.

Richard F. Record, Jr., of Craig & Craig, of Mattoon, for appellee.

JUSTICE GREEN delivered the opinion of the court:

Under the terms of section 13—212 of the Code of Civil Procedure, the two-year limitation period for bringing malpractice actions by patients against physicians starts to run on the date "on which the claimant knew, or through the use of reasonable diligence should have known, or received notice in writing of the existence of the injury or death" giving rise to the cause of action. (Ill. Rev. Stat. 1983, ch. 110, par. 13—212.) Such claimants are held to have discovered the existence of such a cause of action when they knew of their injury and should have realized that they "may not have been receiving proper diagnosis and treatment." *Witherell v. Weimer* (1981), 85 Ill. 2d 146, 157, 421 N.E.2d 869, 874.

On the other hand, malpractice claimants cannot make out a *prima facie* case of malpractice without opinion testimony by a medical expert (1) as to the standard of skill required of the defendant physician; and (2) that the defendant physician failed to perform to that standard. (*Borowski v. Von Solbrig* (1975), 60 Ill. 2d 418, 328 N.E.2d 301; *Lebrecht v. Tuli* (1985), 130 Ill. App. 3d 457, 473 N.E.2d 1322.) The dichotomy between the strict proof necessary to make a *prima facie* case and the lesser standard which (1) puts a claimant on notice of the likelihood of a malpractice cause of action, and (2) triggers the running of the two-year limitation period lies at the heart of this case.

On November 28, 1983, plaintiff Darlene Beasley, and her husband, Clarence Beasley, brought suit in the circuit court of Vermilion County charging defendant, Dr. Kamal Abusief, with medical malpractice. Darlene sued for her injuries. Clarence sued for loss of consortium. The affirmative defense of the two-year limitation period of section 13—212 was raised by defendant, first by motion and then by answer. By the terms of section 13—203 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 13—203), the loss-of-consortium claim was subject to the same limitation period as that for the underlying action by Darlene. Ultimately, the circuit court directed that the issue of the statute-of-limitations defense be separately tried. At the same time, the court denied motions by each side for summary judgment. On September 27, 1985, the court entered judgment on a verdict for defendant on the issue of the limitation defense, thus dis-

posing of the case.

Plaintiffs have appealed contending (1) the court should have directed a verdict in their favor rejecting the statute-of-limitation defense; and (2) the court erred in refusing an instruction tendered by plaintiffs explaining the necessity for expert testimony in order to prove malpractice. We affirm.

As the complaint was filed on November 28, 1983, the principal factual issue for the jury was whether, within the meaning of section 13—212, plaintiffs "knew, or through the use of reasonable diligence, should have known" by November 28, 1981, that Darlene had been injured by defendant's negligent treatment. As we will explain, we conclude that the jury could properly have found that plaintiff had, or should have had, this knowledge by late January or early February 1981. Most of the underlying facts are undisputed and were shown by the testimony of the plaintiffs called by the defense pursuant to section 2—1102 of the Code of Civil Procedure (Ill. Rev. Stat. 1983, ch. 110, par. 2—1102).

In 1979, plaintiffs consulted defendant in regard to their inability to have a child. Darlene had experienced recurrent pain in her left ovary since she was in her teens, and several physicians had told her that removal would ultimately be required. Defendant hospitalized Darlene for tests and medication, and in December 1979 performed surgery removing her uterus, which had a tumor, and repairing her ovary. Darlene had told defendant of the advice she had received concerning the ultimate removal of the ovary. Darlene complained of increased pain after the surgery. She testified that her stomach then appeared bloated and was tender when touched. In July 1980, defendant scheduled reparative surgery to remove scar tissue. The testimony of the Beasleys was in dispute as to whether they discussed removal of the ovary with defendant before this operation, but Darlene testified that she was upset afterwards because it was not removed. She stated that she expected it to be removed because she thought it was the source of her pain. Clarence testified that he too was upset when, after the second surgery, defendant told him that the ovary was not removed. Clarence testified that when he then informed defendant of his displeasure, defendant "let [Clarence] know that he was the doctor."

Darlene's pain worsened after the second surgery. In October 1980, she contacted Dr. Lewis Trupin. Trupin recommended surgery and referred her to a surgeon, Dr. Homer Hindman, who removed both ovaries on January 28, 1981. The ovary upon which the previous surgery had been performed had a cyst on it the size of a grapefruit,

and the other ovary had apparently become infected because of the cyst. Prior to the surgery, Darlene had been in great pain, but the pain subsided after the surgery. Following both the reparative surgery of July 1980 and Dr. Hindman's surgery, Darlene spoke with a cousin who was a nurse. The cousin had questioned why defendant had not removed the ovary. After Dr. Hindman's surgery revealed the cyst, the cousin had told Darlene that she wondered how the cyst could have grown so large in the six months between the last surgery performed by defendant and that when the ovary was removed.

In the spring of 1982, while discussing a workers' compensation case with a Chicago lawyer, Darlene asked him about a suit against defendant and was advised to contact a local attorney. In June of 1982, while discussing an automobile collision with her present attorney, William Garrison, she inquired about a suit against defendant. He informed her of the necessity of obtaining a favorable opinion of a medical expert in order to establish negligence on the part of defendant. Upon being retained, Garrison promptly wrote Dr. Trupin as to Trupin's opinion in regard to Darlene's prior treatment. Trupin answered stating that he had no information that would infer any impropriety in the prior treatment given plaintiff by defendant. Darlene testified that she then felt that she had no basis for a malpractice suit against defendant. However, upon further prompt inquiry by Garrison, a medical report from an independent evaluation service was obtained on April 25, 1983, which indicated that defendant had been negligent. As indicated, suit was filed on November 28, 1983.

The case of *Witherell v. Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869, is the definitive case on the amount of information which must be available to an injured person in order to trigger the running of the two-year limitation period of section 13—212. There, a woman who had been taking birth-control pills developed blood clots in her leg. She brought suit against two physicians who had permitted her to continue taking the pills long after she exhibited symptoms of the clots and against the manufacturer of the pills, which she contended had given insufficient warning of the danger of clots developing in users' legs. Upon defendants' motions supported by affidavits and depositions, the trial court dismissed the complaint on the basis that a two-year limitation period had passed since plaintiff discovered or should have discovered the existence of her cause of action. The appellate court reversed, holding that a question of fact existed on the discovery issue. The supreme court held that the two-year period was shown to have expired as a matter of law. It upheld the trial court's dismissal of the count against the manufacturer but held that al-

though plaintiff should have known of her cause of action against the physicians more than two years before filing of her complaint, the physicians' conduct in reassuring her that she could use the pills may have estopped them from raising a limitations defense. The case was remanded for a factual determination of the estoppel issue.

In *Witherell*, the depositions viewed most favorably to the plaintiff showed (1) shortly after starting use of the pills, plaintiff noticed spasms and pain in her left leg; (2) one of the physicians diagnosed her problem as a blood clot, but the other told her she merely had a muscular problem; (3) both doctors permitted her to continue use of the pills; (4) over the next nine years, she was hospitalized several times, but one of the physicians continued to diagnose her problem as muscular; and (5) after hospitalization in 1976, she consulted another physician and found that she had a serious blood clot in her leg.

The *Witherell* court explained that confusion existed in the cases as to when a plaintiff has discovered an injury thus starting the running of the two-year limitation period. The court then stated:

"The statute starts to run when a person knows or reasonably should know of his injury and also knows or reasonably should know that it was wrongfully caused. *At that point the burden is upon the injured person to inquire further as to the existence of a cause of action.*" (Emphasis added.) (*Witherell v. Weimer* (1981), 85 Ill. 2d 146, 156, 421 N.E.2d 869, 874.)

However, the foregoing language was amplified later in the opinion when the court said that it was "inconceivable to [them] that a reasonable person would not have realized" at the time of a certain hospitalization when one physician told her she had a clot, "that she *may not* have been receiving proper diagnosis and treatment." (Emphasis added.) (85 Ill. 2d 146, 157, 421 N.E.2d 869, 874.) Thus, the combination of the foregoing statements by the court indicates the discovery takes place when the injured party has reason to believe a strong likelihood exists that treatment has been improper and, at that time, the injured person is under a duty to further investigate before initiating a suit. The apparent purpose of the two-year period is to give the injured person that period of time to make the investigation.

Subsequent to *Witherell*, the supreme court held that jury questions were presented as to when the existence of a tort was discovered in *Knox College v. Celotex Corp.* (1981), 88 Ill. 2d 407, 430 N.E.2d 976, and *Nolan v. Johns-Manville Asbestos* (1981), 85 Ill. 2d 161, 421 N.E.2d 864. The former case concerns allegations of fraud and deceit in the promotion and sale of a roofing system by a defendant to a plaintiff. Various repairs to the roof had been required prior

to the beginning of the two-year period before suit was filed, but the plaintiff did not learn that the entire roofing membrane and insulation were faulty until a date less than two years before filing suit. In *Nolan*, a strict-liability suit was brought by a worker using asbestos manufactured by the defendant. The plaintiff had been aware that he had lung difficulties for years, and in 1968, his union began publishing findings concerning the relationship between exposure to asbestos and lung disease. However, his condition was not diagnosed as asbestosis and tuberculosis until May 15, 1973. He filed suit on May 9, 1975.

The undisputed facts here, where the discovery question was submitted to a jury, and the facts most favorable to the plaintiff in *Witherell*, where the court ruled as a matter of law, have some similarity. Both injuries preexisted the treatment. Both injured parties had started treatment and suffered considerable pain thereafter long before the two-year period was contended to have started. During that time, Darlene Beasley had been told that her ovary would eventually have to be removed, and the *Witherell* plaintiff had received medical advice that she had a clot. Both had questions in their minds as to the propriety of their treatment and had been told by lay persons that their present treatment was likely wrong. Darlene's successful surgery by Dr. Hindman revealing the existence of a large tumor on the suspect ovary occurred 2 years and 10 months before the complaint was filed. Clearly, the trial court could have found that by this time, Darlene was required to have known that "she may not have been receiving proper diagnosis and treatment" just as the *Witherell* court concluded as to that plaintiff after she underwent her second hospitalization for her leg problems.

The important difference between this case and *Witherell* arises from the receipt by Garrison of the letter from Dr. Trupin on July 15, 1982, less than two years after the surgery performed by Dr. Hindman revealing the large tumor. This difference illustrates the problem that arises from a rule which puts an injured party on notice of the existence of a cause of action before that party has substantial reason to believe that he or she can make a *prima facie* case. If Garrison had filed suit at the time of receipt of that letter, he would have done so in the face of a letter from the physician who had made an accurate diagnosis of Darlene's condition and who presumably knew as much as anyone about her case, stating that he was unaware of any negligence by the defendant. Filing suit at that time would not have served a public policy of avoiding frivolous litigation. (See *Snyder v. Judar* (1985), 132 Ill. App. 3d 116, 119, 477 N.E.2d 47, 48-49.) On the other hand, by waiting, Garrison risked the running of the two-year

period of limitations.

The answer to the dilemma presented is not easy to come by, and no perfect solution is evident. Holding that the limitation period is not triggered until a prospective malpractice plaintiff secures an expert witness qualified to testify to the described necessary elements for a *prima facie* case would clearly extend the limitation period unduly and leave the four-year period of section 13—212, after which a defendant has absolute repose, as the only substantial protection that such a defendant would have against stale claims.

■ Plaintiffs do not suggest that the medical expert need be obtained before the limitation period starts. Rather, they contend that the Trupin letter should have tolled any limitation period then running. However, section 13—212 lists as the situations tolling the running of the two-year period: (1) the minority of the injured party; (2) his or her mental incapacity; and (3) his or her incarceration on criminal charges. We are reluctant to extend by judicial fiat the legislatively determined grounds for tolling. Moreover, recognizing that professionals are reluctant to be critical of their brethren, we would be apprehensive that a medical opinion detrimental to a cause of action for malpractice is likely to exist in a large number of cases. The rule requested by plaintiffs would be likely to create almost as serious a problem as would a rule that the limitation period does not begin to run until a favorable medical opinion is available.

As indicated, we conclude that under *Witherell*, the two-year limitation period starts when the injured party knows or should have known that he is injured and has reason to believe that it is very likely that the injury resulted from negligent treatment. The latter belief need not be as strong as it would be if a medical opinion favorable to the existence of a cause of action is available. Here, the jury could properly have determined that the limitation period began in late January or early February 1981, after the surgery by Dr. Hindman. The jury could have concluded that, by then, plaintiff should have known that "she *may not* have been receiving proper diagnosis and treatment." (Emphasis added.) (*Witherell v. Weimer* (1981), 85 Ill. 2d 146, 421 N.E.2d 869.) By no later date than that, plaintiffs should have begun, in earnest, to seek legal advice of counsel to determine whether they had viable claims. Diligence at that time would likely have given plaintiffs' attorney time to obtain the allegedly favorable medical witness and then to file suit before the two-year period expired.

■ We recognize the quandary in which plaintiffs' counsel was placed upon receipt of the Trupin letter and the harshness of the result from the plaintiffs' point of view. However, we are bound by

the statutory provision and the precedent. Moreover, we cannot find a rule different than that imposed here that would be viable and still satisfy all of the conflicting public interests. Plaintiffs suggest that we hold that defendant's conduct in assuring Darlene that his course of treatment was proper operated to estop him from raising the limitations defense, as was done in *Witherell*. There, the plaintiff filed a *pro se* action shortly after she ceased relying on the defendant doctors. Here, Darlene had obtained the care of other physicians three years before suit was filed. The evidence does not indicate that reliance on defendant's advice was a factor in allowing the statutory period to run. Lack of plaintiffs' pleading estoppel aside, we do not find estoppel to have been shown by the evidence.

The evidence supported the verdict for the defendant on the limitations defense.

■ Plaintiffs' assertion that the trial court erred in ruling on instructions concerns that court's refusal of the following instruction tendered by plaintiffs:

"Under Illinois law, a person may not recover damages for injuries which he alleges to have been caused by medical negligence unless he can show that the physician of whom he complains failed to meet the applicable standard of care and that this failure caused the injury complained of.

The applicable standard of care and the failure to meet that standard as a cause of a person's injury must be established by expert testimony except in cases where the physician's conduct is so grossly negligent or the treatment so common that a layman could readily appraise it."

The instruction concerns the proof necessary to make a *prima facie* case of medical malpractice. As we have indicated, the lack of evidence of a witness to produce the required testimony does not preclude the starting of the two-year period. Even if the lack of such a witness is a matter worthy of consideration by the jury in determining whether a plaintiff knows or should know that the medical practitioner was negligent, the abstract nature of the instruction would likely have confused the jury as to the application of the instruction to the evidence. The court did not err in refusing the instruction.

As we have mentioned, the trial court ordered a bifurcated procedure for the trial of the cause with the issue of the affirmative defense being tried separately and first. Defendant has requested that we speak in a definitive manner upholding generally the use of this procedure. No question has been raised as to the propriety of the bifurcation of the triable issues here. Because the affirmative defense

was controlling here, a substantial economy to all concerned resulted. Defendant suggests that such a procedure also affords protection to defendants from matters relevant only to the limitation defense and otherwise prejudicial to a defendant from getting before a jury which tries the other issues. Defendant asks that we inform trial courts that the bifurcated procedure should be used for this reason in other cases. However, as the issue of bifurcation was not raised in this cause, and we have no adversary briefing on the subject, we deem it inappropriate for us to attempt to pronounce definitive *dictum* on the subject.

We affirm for the reasons stated.

Affirmed.

McCULLOUGH, P.J., and WEBBER, J., concur.